James D. LUTZ, Plaintiff,

v.

PURDUE UNIVERSITY, Defendant.

No. CIV. 4:00cv006AS.

United States District Court,
N.D. Indiana,
Hammond Division.

March 9, 2001.

James D. Lutz, pro se.

Deborah B. Trice, Heather L. Miller. Lafayette, IN, for defendant.

### MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This matter is before the Court on Defendant's, Purdue University ("University" or "Purdue"), motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure or in the alternative motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Plaintiff, James Lutz ("Lutz") has filed a claim for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964. For the following reasons that Defendant's motion to dismiss is now **DENIED** and motion for summary judgment is now **GRANTED**.

### I. FACTUAL BACKGROUND

On August 17, 1997, Mr. Lutz began his employment with Purdue after entering into the first of two consecutive one-year contracts with Purdue University as a visiting associate professor. Again on August 17, 1998, Lutz entered into an employment contract with Purdue for the

1998/1999 school year. (D's Stat. of Material Fact at ¶¶ 3–4). Each of these separate contracts offered by Purdue and accepted by Lutz specified a duration of one year. (Id.). The offer letters were extended by Professor Vincent P. Drnevich, Head of Civil Engineering Department at Purdue. The offer letters to Lutz stated in pertinent part:

> This offer is on an academic year basis ... You are not officially employed until a completed and signed contract has been approved by the President of Purdue University.

Furthermore, Lutz's contract specified that he held a non-tenure position and that the term of appointment may be extended only by the execution of a Form 19. (D's Stat. of Material Fact at ¶¶ 5–6). During his two years at Purdue, Lutz taught various courses in the School of Civil Engineering. (D's Stat. of Material Fact at ¶ 8). According to Purdue University, it maintains a policy whereby visiting faculty are generally offered positions for only two years.[1] Dr. Drnevich maintained sole discretion to seek permission from Vice President Ringel with respect to whether a third contract would be extended to Lutz. (D's Stat. of Material Fact at ¶ 11).

During his time at Purdue, Lutz received several poor student evaluations for his teaching. (D's Stat. of Material Fact at ¶ 12). Dr. Drnevich reviewed the teaching evaluations submitted by Lutz's students. (D's Stat. of Material Fact at ¶ 14). These evaluations indicated that many students felt that Lutz's teaching skills were inadequate. (Id.). Lutz disputes this contention in his brief, stating that these evaluations were somehow fabricated. He offers no direct or circumstantial evidence from which it can be inferred that these evaluations were not valid. Additionally, Professor Dan Halpin, Lutz's immediate supervisor, admitted that he had received complaints from students concerning his

---

1. Appointments "beyond the normal two year term" require special permission through the approval of Robert L. Ringel, Executive Vice President for Academic Affairs. (D's Stat. of Material Fact at ¶ 10)

teaching and ineffective instruction. (D's Stat. of Material Fact at ¶ 16).

Furthermore, Dr. Drnevich personally felt that Mr. Lutz was a poor teacher after sitting in on a lecture conducted by Lutz. (Affidavit of Dr. Drnevich at ¶ 11). Drnevich even went so far as to suggest to Lutz that he participate in programs offered by the University to improve his teaching skills. (D's Stat. of Material Fact at ¶ 15). However, the negative student evaluations persisted. (Id.). Drnevich determined that he would not extend a third contract to Lutz based upon his evaluation of Lutz's teaching abilities and the comments made by many students. On April 5, 1999, Halpin communicated to Lutz that it was the decision of the University not to extend to him a third contract. (D's Stat. of Material Fact at ¶ 17). Subsequently, Lutz obtained employment with the Indiana Department of Transportation in July of 1999.

On March 26, 1999, prior to his notification that he would not be offered a third contract, Lutz discovered two icons that had been placed on his university computer. (D's Stat. of Material Fact at ¶ 19). The first icon was entitled "condom", the second "nightmare." (Id.). Lutz proceeded to click on the icon and discovered what he describes as images that were obscene or racy in nature. Lutz's description of the images are vague and inconclusive as evidenced by the testimony given at his deposition.

Q: You said that this oriental person was sitting down and you think maybe it was a man, but you don't remember anything about whether this man was dressed or not dressed?

A: I don't recall exactly what clothing the individual had on, if any.

Q: Now, was this a photograph or a cartoon-like drawing, or what was it?

A: I don't know if it was a cartoon or a picture

*     *     *     *     *     *

Q: Now, were the women clothed?

A: You know, I don't recall exactly how much clothing they had on.

*     *     *     *     *     *

Q: Mr. Lutz, can you tell me what they were doing that made you think they [the women] were engaged in some kind of sexual activity with a man?

A: Well, as you mention it, I just looked at it for a fraction of a second and I was offended by what I saw, very offended. No, I cannot tell you exactly what they were doing in the image.

(D's Stat. of Material Fact at ¶ 22) Lutz could not remember whether any of its content was of a sexual nature or not. (D's Stat. of Material Fact at ¶ 23). Lutz contacted computer personnel immediately to have the icons removed from his computer. (D's Stat. of Material Fact at ¶ 25). Additionally, Lutz notified several Purdue personnel, including Drnevich and Halpin, that these files had been placed on his computer. (D's Stat. of Material Fact at ¶ 25–26). The files were removed from Lutz's computer on Wednesday, March 31, 1999. (D's Stat. of Material Fact at ¶ 27).

Purdue contends that Lutz's reporting of the files had no impact on Drnevich's decision not to offer Lutz a third one-year contract. Drnevich avers that he made the decision not to offer a third one-year contract prior to Lutz's report of the incident. (Affidavit of Vincent Drnevich, ¶ 21). On April 5, 1999, Lutz met with Drnevich to discuss his decision not to offer him a third contract. (D's Stat. of Material Fact at ¶ 17). Drnevich stated that his decision was based upon Lutz's poor teaching abilities. After the meeting, Lutz sent an e-mail message to contest Drnevich's criticisms of his teaching. (D's Stat. of Material Fact at ¶ 17). There is no record of Lutz contending that the decision to not offer him a contract was based upon his reporting of the computer files at that meeting or in the subsequent e-mail.

On April 30, 1999, Lutz met with Charlene Moore Hayes ("Hayes"), Director of Personnel Services, and Charles R.

O'Keefe, Jr. ("O'Keefe"), Human Resource Consultant, to discuss the appearance of the files and to express his belief that his reporting of the files led to the decision to not offer him a third one-year contract. (D's Stat. of Material Fact at ¶ 30). Again, Purdue denied Lutz's allegation that the decision to not offer him a third contract was in any way linked to his complaints regarding the files. (D's Stat. of Material Fact at ¶ 31). O'Keefe reiterated that Purdue's position was based on Lutz's poor teaching abilities in a May 12, 1999 letter. (D's Stat. of Material Fact at ¶ 31).

Lutz makes additional claims that Purdue has defamed him as a result of O'Keefe's May 12th letter and that Purdue has retaliated by "blacklisting" him for complaining of the files. Lutz contends that he was told by Dr. Donn E. Hancher ("Hancher"), Professor of Construction and Engineering Management at the University of Kentucky that Purdue had blacklisted him to hinder his future employment opportunities. (D's Stat. of Material Fact at ¶ 34). Hancher has denied telling Lutz that anyone at Purdue has "blacklisted" him. (D's Stat. of Material Fact at ¶ 35). Rather, Hancher merely informed Lutz that he was concerned that the present lawsuit "would 'not hold up' and that he 'could be blacklisted' if word got out about his Purdue lawsuit." (D's Stat. of Material Fact at ¶ 35). Hancher states that he has "absolutely no knowledge that Professor Dan Halpin or anyone else at Purdue University has taken any actions to 'blacklist' Lutz." (D's Stat. of Material Fact at ¶ 36).

On October 12, 1999, Lutz filed a charge of discrimination with the Indiana Civil Rights Commission and the U.S. Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a right to sue letter subsequently on October 22, 1999. On April 19, 2000, Lutz filed suit against Purdue alleging sexual harassment based upon the two "offensive" files that were placed on his computer and retaliation in the form of Purdue's failure to offer Lutz a third one-year visiting associate professor contract and "blacklisting" him

all in violation of Title VII. Lutz's complaint also appears to make claims of defamation and breach of contract. Lutz did not file an Indiana Tort Claims Act Notice with Purdue University. (D's Stat. of Material Fact at ¶ 33). This case does not involve a pure invocation of 42 U.S.C.1983.

## II. STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c) *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 251–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Lutz must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Electric Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Lutz must present "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e) and only if a "reasonable jury could render a verdict" for Lutz does he defeat summary judgment. *Jordan v. Summers* 205 F.3d 337, 342 (7th Cir.2000). *See Also Vanasco v. National Louis Univ.,* 137 F.3d 962, 965 (7th Cir.1998).

The Court agrees with Purdue's contention that Mr. Lutz's response has made it extremely difficult to identify which facts establish a genuine issue precluding summary judgment. In accordance with *Timms v. Frank,* 953 F.2d 281, 283–284 (7th Cir.1992), Lutz was notified of his requirement to come forth with affidavits or other admissible evidence in order to establish a genuine issue of material fact to defeat Purdue's motion for summary judgment. Having been given this requisite notice, Lutz is not excused from the requirements of Rule 56 in coming forward with affidavits or other admissible evi-

dence to establish a genuine issue of fact because of his *pro se* status. *Jones v. Phipps,* 39 F.3d 158, 163 (7th Cir.1994).

## III. DISCUSSION

### A. Eleventh Amendment Defense

Purdue first asserts that Lutz's Title VII claim is barred. by the Eleventh Amendment. The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

The Eleventh Amendment prohibits an action by a private individual for monetary damages against a State. *Board of Trustees of the University of Alabama, et al v. Garrett,* et al. 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 72–73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). However, in certain limited situations, the Court has recognized an abrogation of the States' Eleventh Amendment defense. In *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Supreme Court recognized that sovereign immunity is limited by the enforcement provisions of § 5 of the Fourteenth Amendment. *Id.,* at 456, 96 S.Ct. 2666. In *Fitzpatrick* the Court found that the Eleventh Amendment did not preclude certain male employees from asserting damage claims under Title VII based on their sex. Justice Rehnquist, now Chief Justice, writing for the Court stated:

> We think that Congress may, in determining what is "appropriate legislation" for purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts. *Fitzpatrick* at 456, 96 S.Ct. 2666; (citations omitted).

Purdue cites the recent Supreme Court opinion in *Kimel v. Florida Board of Regents, supra,* 120 S.Ct. 631, in support of their contention that Lutz's Title VII claim is barred. In *Kimel,* the Court concluded that the ADEA's requirements were disproportionate to any unconstitutional conduct by state or local governments. *Id.* at 645. Furthermore, the Court has considered claims of unconstitutional age discrimination under the Equal Protection Clause finding that they did not violate the Fourteenth Amendment. *Id.; Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); *Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979).

The Supreme Court in *Board of Trustees of the University of Alabama v. Garrett, supra,* 536 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866, (2001), again limited Congress's power to abrogate the Eleventh Amendment. In *Garrett,* the Court held that Congress failed to identify a clear pattern of state discrimination against disabled employees in finding that damage claims under the Americans with Disability Act ("ADA") did not apply to state or local governments. *Garrett, supra* 531 U.S. ——, 121 S.Ct. 955 (2001). While it is true that the Supreme Court in these recent 5–4 decisions has curtailed the power of Congress to bring various damage claims against state and local governments, the Court has not revisited its holding in *Fitzpatrick* to curtail damage claims based upon a plaintiff's gender under Title VII.

In *Holman v. Indiana,* 211 F.3d 399 (7th Cir.2000), a decision arising after *Kimel,* the District Court dismissed a husband and wife's claim for sexual harassment resulting from their supervisor. The Court of Appeals affirmed the district court's dismissal noting that Title VII liability is precluded when both sexes are treated badly. However, Circuit Judge Manion noted the recent decision in *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

In *Oncale,* the Supreme Court reiterated that "Title VII's prohibition of dis-

crimination 'because of ... sex' protects men as well as women," and it held that this prohibition applies to the same-sex harasser, whether or not that harasser is motivated by sexual desire. *Holman* at 402. (internal citations omitted.)

■ In light of the Supreme Court's decision in *Fitzpatrick* and the recent Seventh Circuit opinion in *Holman* this Court finds that Lutz's Title VII claim with respect to sexual harassment and retaliation are not barred by the Eleventh Amendment. Therefore, Purdue's motion to dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure is now **DENIED.**

## B. SEXUAL HARASSMENT CLAIM

■ Under Title VII employers are prohibited from discriminating on the basis of sex: "It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1); *Gentry v. Export Packaging Co.,* 238 F.3d 842, 846 (7th Cir.2001). The crux of Lutz's sexual harassment claims center around two computer generated files containing various images that were mysteriously loaded by undisclosed person or persons onto his computer. These images are described by Lutz as being somewhat sexual in nature. It is quite uncertain how graphic and offensive the pictures actually were because Lutz readily admits that he only viewed these pictures for a matter of seconds. However, even assuming that these pictures registered at the high end of the offensive scale, a claim for sexual harassment simply is not present.

■ In *Holman* discussed *supra,* the Seventh Circuit reiterated the concern that Title VII not be used to monitor, regulate or constrain workplace interactions even though the actions might constitute harassment.

"But that risk ... is adequately met by careful attention to the requirements of the statute. Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination ... because of ... sex. The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Holman* 211 F.3d at 404; citing *Oncale, supra* 523 U.S. at 80, 118 S.Ct. 998. Sexual subject matter simply does not equal sexual harassment. It takes much more. In *Oncale,* the Supreme Court noted that a claim of sexual harassment will not arise simply because the conduct was tinged with offensive sexual connotations as it appears to be the case here. 523 U.S. at 81, 118 S.Ct. 998. Furthermore, Title VII only prohibits behavior that is so objectively offensive as to alter the conditions of the victim's employment. *Id.* The severity of the situation is judged from an objective, reasonable person standard. *Id.*

■ Here it can be clearly said that an objective reasonable person would not be wholly offended by the pictures on Lutz's computer so as to create a hostile work environment. Pictures of a sexual nature do not rise to the level of sexual harassment. *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson,* 212 F.3d 976, 977 (7th Cir.2000); (showing employee a book with pictures of women in bondage and black leather, among other comments.); *Cowan v. Prudential Ins. Co. of Am.,* 141 F.3d 751 (7th Cir.1998); (circulating a cartoon in the office). Furthermore, it is uncontradicted by Lutz that he viewed the pictures for only a matter of seconds and that the pictures remained on his computer for a matter of days. Therefore, viewing Lutz's claim of sexual harassment in a light most favorable to him, it fails as a matter of law.

## C. RETALIATION CLAIM

Lutz next asserts a claim for retaliation under Title VII of the Civil Rights Act. Title VII prohibits an employer from discriminating "against any of his employees

or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter or because the employee or applicant has made a charge, testified, assisted ... under [Title VII]." 42 U.S.C. § 2000e–3(a) (West 1994); See Also; *Walker v. Glickman*, 241 F.3d 884 (7th Cir.2001). Again his retaliation claims stem from his complaint that the University allegedly loaded the inappropriate images on his computer. Lutz contends that he was not offered a new teaching contract by Purdue because he reported that the University had engaged in sexual harassment.

In order for Lutz to prevail on a claim of retaliation, he must either offer direct evidence of discrimination or proceed under the burden shifting method set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, (1973). *Jordan v. Summers* 205 F.3d 337, 342 (7th Cir.2000). Under *McDonnell Douglas* the plaintiff must first prove, by a preponderance of the evidence, a *prima facie* case of retaliation. *Smart v. Ball State University* 89 F.3d 437, 439 (7th Cir.1996). The burden then shifts to the employer to provide a nonretaliatory explanation for its actions. *Smart* 89 F.3d at 439. "Once the employer has offered a neutral reason for its actions, the burden shifts back to the employee to demonstrate that the employer's stated reason is merely a pretext for covering up discriminatory conduct." *Id.*

■ A *prima facie* case of retaliation is established when a plaintiff shows that the following three elements are present: "1) he engaged in a protected activity under Title VII; 2) he suffered an adverse employment action subsequent to his participation; and 3) there exists a causal connection between the adverse employment action and his participation in the protected activity." *Smart* 89 F.3d at 440 citing *Koelsch v. Beltone Electronics Corp.* 46 F.3d 705, 708 (7th Cir.1995). Purdue contends that Lutz has failed to establish a *prima facie* case of retaliation or in the alternative that it has offered a legitimate non-pretextual reason for not offering Lutz a contract.

### a. Alleged "blacklisting"

■ With respect to the alleged "blacklisting", Lutz has failed to establish a *prima facie* case of retaliation showing that he suffered an adverse employment action subsequent to his participation in a protected activity under Title VII. Allegations of professional incompetence rise to the level of an adverse action "only if the circumstances of an employee's discharge so sully the employee's reputation or character that the employee will essentially be blacklisted in his or her chosen profession." *Head v. Chicago Sch. Reform Bd. of Trustees*, 225 F.3d 794, 801 (7th Cir. 2000). In *Head* the Seventh Circuit found that the allegations of stigma fell short of this threshold. *Id.*

Similarly, Lutz's claims of "blacklisting" fall well short of the stigma needed to establish an adverse employment action. Lutz has failed to introduce any competent evidence that he was blacklisted by officials at Purdue. He makes an unsupported allegation that Dr. Hancher informed him that Halpin had "blacklisted" him. All evidence leads to an alternative conclusion. Both Halpin and Dr. Hancher deny the allegation that Purdue University has "blacklisted" Lutz. Rather Hancher informed Lutz that he was concerned that this lawsuit might not 'hold up' and that it may hurt his future opportunities for employment. (Affidavit of Dr. Donn E. Hancher, ¶¶ 5–7).

Furthermore, Lutz has obtained two positions in the civil engineering field subsequent to his leaving Purdue University. Lutz obtained a highway engineering position with the Indiana Department of Transportation in July of 1999. In August of 2000, Lutz obtained a visiting professor position with the Department of Civil Engineering at the University of New Mexico. These positions clearly belie the assertion that Lutz has been blacklisted from his chosen field. Therefore, Lutz has

failed to establish a *prima facie* case as it relates to his allegation that Purdue blacklisted him.

### b. Refusal to extend third one-year employment contract.

The Court now puts to one side Lutz's *prima facie* showing of discrimination in light of Purdue's legitimate non-discriminatory reason for not offering Lutz a third one-year contract. *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir.1998), cert. denied, 527 U.S. 1003, 119 S.Ct. 2337, 144 L.Ed.2d 235 (1999). In assessing Purdue's legitimate reason, it is not within the Court's authority to "decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir.1997). Purdue has offered the following legitimate reasons in not extending a third one-year contract.

Dr. Drnevich determined through his own observations and from numerous negative student evaluations that Lutz's teaching skills were inadequate. It was this assessment that led him not to seek leave from Dr. Ringel to offer Lutz a new contract. Drnevich discussed his decision with Halpin who initially supported offering Lutz a third one-year contract. However, during the Spring 1999 semester, Halpin met with several of Lutz's students concerning his ineffective teaching methods. Halpin concurred with Drnevich's decision after the meeting with Lutz's students. Thus Purdue has proffered a legitimate reason for not extending a third one-year contract.

To prevent summary judgment, Lutz must present evidence that Purdue is insincere when it claims to have decided not to extend an offer because of his poor teaching record. *Essex v. United Parcel Serv.*, 111 F.3d 1304, 1309 (7th Cir.1997). Lutz must specifically refute the facts that support Purdue's claim of poor teaching abilities to create a genuine issue of fact to avoid summary judgment. *King v. Preferred Technical Group*, 166 F.3d 887, 894

(7th Cir.1999); (claim of retaliation supported by affidavits and depositions sufficient to cast doubt on employer's reasons for termination). In *Walker v. Glickman*, a recent Seventh Circuit decision, the Court of Appeals found that the decision not to hire Walker was based on legitimate criteria that showed that he was not the most qualified candidate. 241 F.3d 884 (7th Cir.2001). Again the Court of Appeals reiterated that it is not the court's role to determine whether the decision was right or not. *Walker*, 241 F.3d at 889. Here Drnevich's decision was based on his evaluation of Lutz's teaching, the evaluations made by Lutz's students and Halpin's discussions with various students concerning Lutz's poor teaching.

It is important to note that on November 3, 2000, simultaneous with filing its motion for summary judgment, Lutz was given notice by Purdue pursuant to *Timms v. Frank*, 953 F.2d 281, 283–284 (7th Cir.1992) of his obligation to come forward with sworn affidavits to dispute the version of facts given by the University. Furthermore, the notice stated that unless he responded with sworn statements which contradict the important facts claimed by Purdue, the district court will accept its uncontested facts as true.

■ Lutz has failed to come forward with evidence that disputes that Drnevich and Halpin received negative evaluations from students in the courses taught by Lutz. Although Lutz makes vague conclusions in his brief that the student evaluations were somehow inaccurate or had been falsified. Lutz has failed to come forth with affidavits or other competent evidence to establish that these student evaluations were in fact not reliable. *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir.1985). In sum, Lutz has failed to come forward with evidence to dispute that Drnevich made the decision not to offer a third contract based upon his and other students' view of Lutz's teaching abilities. Therefore, Lutz has failed to present sufficient evidence to demonstrate

that Purdue's reason was a lie for the action it took. *Walker*, 241 F.3d at 889.

## D. DEFAMATION CLAIM

■ Next, Lutz alleges that the University has defamed him through statements made about his teaching in a May 12, 1999 letter sent to him by O'Keefe. In order to pursue a state tort claim against Purdue, such as defamation, Lutz is required to comply with the Indiana Tort Claims Act. There is no jurisdiction here alleged under 28 U.S.C. § 1332. This claim must be based on Indiana state substantive law and cannot be based on federal question jurisdiction. See *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

The Indiana Torts Claim Act or "ITCA" provides that a claim against a political subdivision is barred unless notice is filed with the governing body of the political subdivision within 180 days after the loss occurs. Ind.Code § 34–13–3–8 (Michie 1998); See Also *Wells v. Vincennes University*, 982 F.2d 1147, 1152 (7th Cir.1992). A "governmental entity" is defined as either the state or a political subdivision of the state. Ind.Code § 34–6–2–49 (Michie 1998). The ITCA specifically includes Purdue University in its list of "political subdivisions," Ind.Code § 34–6–2–110(7) (Michie 1998), and defines an "employee" or "public employee" as a "person presently or formerly acting on behalf of a governmental entity." Ind.Code § 34–6–2–38. (Michie 1998). The University contends that Lutz never provided the required notice under the statute. Lutz fails to address his noncompliance with the Indiana Tort Claims Act in his brief nor does he provide by affidavit that he complied with the Act. Therefore, Purdue's motion for summary judgment with respect to Lutz's defamation claim is now **GRANTED.**

## E. CANCELLATION OF CONTRACT

Lutz has raised claims that his contract was impermissibly rescinded in retaliation for his reporting of the obscene files. On August 13, 1997, Lutz signed his first written contact with Purdue, specifying his term of employment beginning August 17, 1997 and ending May 17, 1998. On July 28, 1998, Lutz signed a second contract with Purdue, which specified a term of employment beginning August 17, 1998 and ending May 16, 1999. Both contracts specified that the term of this appointment, as to a non-tenured faculty employee, may be extended only by the execution of a Form 19. (D's Statement of material facts at ¶ 6). Purdue maintains a policy by which visiting faculty such as Lutz, are generally offered positions for only two years. Appointments beyond two years required the permission of Robert Ringel, Executive Vice President for Academic Affairs. (D's Statement of material facts at ¶ 10). As discussed previously, Drnevich determined that a third contract would not be offered to Lutz in light of his poor teaching skills. Lutz was never offered nor did he sign a third teaching contract.

■ Next Lutz argues that he was *orally* promised a third one-year contract to teach at Purdue University. Lutz contends that Halpin assured him that a contract would be forthcoming. However, Halpin had no authority to make such contract offers. Furthermore, the terms of Lutz's prior contracts clearly demonstrate that a third one-year contract was not guaranteed. *Colburn v. Trustees of Indiana University*, 973 F.2d 581, 590 (7th Cir.1992). The decision to not extend a contract to Lutz was the decision of the Department Head, Dr. Drnevich. Lutz was clearly aware of this, having received both of his previous offers from Drnevich. Additionally, both of the previous contracts signed by Lutz specifically state that "this offer is on an academic year basis ... You are not officially employed until a completed and signed contract has been approved by the President of Purdue University." (D's Statement of material facts at ¶ 7). Therefore any claim that Lutz's contract was impermissibly canceled or rescinded is without merit.

## IV. CONCLUSION

For the foregoing reasons the Defendant's motion for summary judgment pur-

suant to Rule 56 of the Federal Rules of Civil Procedure is now **GRANTED.** Each party will bear its own costs. **IT IS SO ORDERED.**