Benjamin W. MERCER, Plaintiff-Appellant,†

v.

CITY OF FOND DU LAC, A Wisconsin Municipal
Corporation, Sal Curcurio, in his official capacity
as City Council Member, Mark Jurgella, in his
official capacity as City Council Member, Lindee
Kimball, in her official capacity as City Council
Member, Steven Michels, in his official capacity
as City Council Member, James Nagle, in his
official capacity as City Council Member, Jim
Sabel, in his official capacity as City Council
Member, Michael Schmal, in his official capacity
as City Council Member and Tom Ahrens, in his
official capacity as former City Manager,
Defendants-Respondents.

Court of Appeals

*No. 2009AP505. Submitted on briefs October 13, 2009.
—Decided December 16, 2009.*

2010 WI App 15

(Also reported in 780 N.W.2d 188.)

† Petition to Review denied 4/19/10.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Steven P. Sager* of *Sager, Colwin, Samuelsen & Associates, S.C.*, Fond du Lac.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Mark F. Yokom* of *Davis & Kuelthau, S.C.*, Oshkosh.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Raymond J. Pollen* and *Remzy D. Bitar* of *Crivello Carlson, S.C.*, Milwaukee.

Before Brown, C.J., Neubauer, P.J, and Snyder, J.

¶ 1. SNYDER, J. Benjamin W. Mercer appeals from a summary judgment in favor of the City of Fond du

Lac, City Council members, and City Manager Tom Ahrens. Mercer contends that the circuit court should not have summarily disposed of his claims, which rested on his allegations of wrongful termination of his employment with the City. He asserts that the circuit court incorrectly concluded that he had resigned from his position. He also appeals from an order directing him to pay $265.68 to the City for photocopy expenses associated with the litigation. He contends the award was improper because internal photocopying costs are not actually paid out as required by WIS. STAT. § 814.04(2) (2007–08).[1] We disagree and affirm the judgment and the order.

## BACKGROUND

¶ 2. The relevant facts are brief and undisputed. Mercer was employed as the human resources director for the City of Fond du Lac from 1991 to 2005. When he was hired, Mercer became subject to personnel policies set forth in the City's policy manual, which included computer use policies and a disciplinary procedure. The disciplinary policy states in relevant part:

> An employee may be subject to discipline for violation of these personnel policies . . . in any of the following forms: demotion, suspension, discharge, written reprimand or verbal reprimand . . . .

> Discipline for a violation of these policies . . . shall be administered in a progressive manner; the least severe discipline shall be administered for first offenses of a less severe nature. Progressively more severe discipline shall be administered for repeat offenses, or for more serious offenses.

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version.

> In the event an employee is charged in a criminal matter . . . such that, in the opinion of the City Manager, the employee's ability to function in his/her capacity as a City employee will be seriously impaired, the employee shall be suspended with or without pay until final judgment . . . has been rendered.

¶ 3. In June 2004, city staff and local police investigated possible criminal activity arising from Mercer's use of the Internet on his work computer. As a result of that investigation, police informed City Manager Ahrens that Mercer was using his work computer to view pornography, but that Mercer had "not possessed or viewed child pornography and criminal charges were not likely." Ahrens issued a letter of reprimand revoking Mercer's Internet privileges and directing Mercer to obtain counseling. Ahrens informed Mercer that if he complied with the terms of the discipline, the letter would be removed from his personnel file in six months.

¶ 4. On March 23, 2005, a personnel matter was placed on the agenda for the city council meeting. According to council member Mark Jurgella, the purpose of the agenda item was to discuss the job performance of Ahrens, "including his handling of a disciplinary issue involving then-Human Resources Director Benjamin Mercer." The council went into closed session and a member of the City's management information systems staff informed the council of the Internet usage it had logged from Mercer's work computer. The council inquired of Ahrens whether he intended additional disciplinary action because "some of the images viewed by Mr. Mercer possibly contained child pornography." The City requested an independent investigation of the matter by the Wisconsin Department of Justice.

¶ 5. After the council meeting, Ahrens went to Mercer's home and told him the City Council "wanted [Mercer] gone." Mercer understood this to mean he was being given a choice, he could resign or he would be terminated. Mercer decided to resign to "try to maintain some sort of employability." He submitted his written resignation on March 28, five days after the council meeting.

¶ 6. On August 10, 2005, the State filed charges against Mercer, alleging thirty-three counts of possession of child pornography. Mercer pled not guilty and, following a jury trial, was convicted on fourteen of the thirty-three charges.

¶ 7. On December 27, 2005, Mercer filed a civil action against the City, its council members, and Ahrens. He made five claims: mandamus, declaratory relief, breach of contract, estoppel, violation of his civil rights, and violation of public policy. Mercer demanded compensation and a directive that he be returned to his position with the city. Ahrens and the City moved for summary judgment and the court held a hearing on December 30, 2008. The court granted summary judgment in favor of all of the defendants and, after a subsequent hearing, awarded costs to the City. Mercer appeals.

## DISCUSSION

¶ 8. We review a circuit court's summary judgment de novo, using the same methodology. *Old Tuckaway Assocs. Ltd. P'ship v. City of Greenfield*, 180 Wis. 2d 254, 278, 509 N.W.2d 323 (Ct. App. 1993). That methodology is well established and need not be repeated here. *See, e.g., Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶¶ 20–24, 241 Wis. 2d 804, 623 N.W.2d 751. Summary

judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Baxter v. DNR*, 165 Wis. 2d 298, 312, 477 N.W.2d 648 (Ct. App. 1991) (citation omitted). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 312 (citation omitted).

¶ 9. Mercer's claims rest on one underlying presumption; that is, that he did not voluntarily resign his position with the City but rather was discharged from his employment. He characterizes the resignation as the result of an " 'indirect' . . . mandate" from the council to terminate Mercer. He contends that his discharge, which he characterizes as "rediscipline," violated his contractual rights under the personnel policies. Specifically, he argues that the disciplinary procedure set forth in the policy manual created a contractual agreement regarding how infractions would be handled by Ahrens and the City. When Ahrens used the letter of reprimand as a form of discipline, Mercer contends, the subsequent "rediscipline" violated his contractual rights. He emphasizes that no new investigation had been done and no new facts were known at the time of the March 23, 2005 council meeting, which prompted the "rediscipline." From that scenario, he extracts his mandamus, estoppel, due process and public policy claims.

¶ 10. The City responds that Mercer's resignation extinguished any claims of wrongdoing. It observes that

Mercer's written note, submitted on March 28, 2005, was a voluntary and unequivocal relinquishment of his job. The City emphasizes that Mercer did not appeal his separation of employment through the City's appeal procedure. The City also directs us to Mercer's deposition, where he commented on his experience in human resources:

> Q: . . . In your position as director of human resources, did you have opportunities to accept written resignations from other employees over the years?
>
> A: Yes.
>
> Q: How many, would you estimate, were handwritten similar to the one you gave Mr. Ahrens?
>
> . . . .
>
> A: 20.
>
> Q: Was it your common practice, when you accepted a resignation like this, to ask them anything like, are you sure you want to do this, give them an opportunity to reconsider?
>
> A: No. I generally took their resignation at face value, that they in fact wanted to resign.

¶ 11. Mercer argued to the circuit court, and repeats here, that even though his resignation on its face appeared voluntary, he was in fact terminated by the City. The doctrine of constructive discharge recognizes that some resignations are coerced, and as such they are tantamount to a termination. *Strozinsky v. School Dist. of Brown Deer*, 2000 WI 97, ¶ 68, 237 Wis. 2d 19, 614 N.W.2d 443. "An employee who departs from the workplace generally cannot pursue a claim against the em-

ployer for wrongful discharge." *Id.* Nonetheless, courts have held that employers should not escape liability where the employer forced a resignation. *Id.* Forced resignations would "invite[] employers to engage in subterfuge as a means of evading the law prohibiting retaliatory discharge." *Id.*, ¶ 68 n.18 (citation omitted).

¶ 12. In an attempt to avoid liability for wrongful discharge, an employer may refrain from expressly firing an employee, preferring instead to engage in conduct causing him or her to quit. *Id.*, ¶ 68. The doctrine of constructive discharge addresses such attempted "end runs." *Id.* Constructive discharge exposes "what is ostensibly a resignation [as] a discharge." *Id.* (citation omitted). "The doctrine operates 'to discard form for substance, to reject sham for reality' and recognizes that certain resignations are, in fact, actual firings." *Id.*

¶ 13. Typically, to succeed on a constructive discharge claim, "a plaintiff must prove both that the defendant engaged in 'harassing behavior sufficiently severe or pervasive to alter the conditions of [his or her] employment' and that 'the abusive working environment became so intolerable that [his or her] resignation qualified as a fitting response.' " *Witte v. DOC,* 434 F.3d 1031, 1035 (7th Cir. 2006) (citation omitted).

¶ 14. Here, the record does not support Mercer's contention that he was constructively discharged. He offers no compelling reason for us to interpret his written resignation as anything more or less than, as he described in his deposition, its "face value." He was familiar with the resignation procedure because he had accepted written resignations from other employees. He

knew the implications of submitting his own resignation. Also, as human resources director for fourteen years, he should have been familiar with the City's appeals process if he felt he was wrongly terminated; yet, he did not take advantage of that process.

¶ 15. The City denies any coercive efforts to obtain Mercer's resignation, and Mercer points only to his suspicions about what transpired during the March 2005 council meeting. He makes much of the hypothesis that the council meddled in personnel matters by forcing Ahrens to issue an ultimatum to Mercer. However, Mercer does not point to any instances of harassment, nor does he dispute that termination would have been an available means of discipline for criminal activity under the terms of the personnel policy. We ascertain no coercion or harassment provoking Mercer's resignation. Mercer earlier explained his resignation as an attempt to "maintain some sort of employability."

¶ 16. Essentially, Mercer's complaint is that he believed the consequence of his improper computer use at work was a letter of reprimand that had a six-month lifespan. When Ahrens raised the specter of additional consequences, Mercer chose to resign rather than keep his job and see the process through. "[A] resignation resulting from a choice between resigning or facing proceedings for dismissal is not tantamount to discharge by coercion . . . ." *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982); *see also Spreen v. Brey*, 961 F.2d 109, 112 (7th Cir. 1992). Furthermore, Mercer can hardly claim that the City engaged in harassment so unbearable that Mercer had no reasonable alternative but to resign. *See Witte*, 434 F.3d at 1035; *Lewandowski v. Two Rivers Public School Dist.*, 711 F. Supp. 1486, 1494–95 (E.D. Wis. 1989). Mercer did not stay with the City to see if or

how his conditions of employment had changed. As a result, he cannot demonstrate that an inhospitable workplace drove him to resign.

¶ 17. Without facts to support a constructive termination, Mercer's claims for mandamus, breach of contract and estoppel, along with his allegations of due process and public policy violations, have no legal foundation. Summary judgment provided an appropriate vehicle for resolving Mercer's claims and the circuit court correctly concluded that Mercer voluntarily resigned his position with the City.

■■■

¶ 18. This brings us to the circuit court order awarding costs to the City. WISCONSIN STAT. ch. 814 covers costs in civil actions and provides that a defendant may recover costs under certain circumstances. *See* WIS. STAT. § 814.03. Section 814.04(2) describes items that may be included in costs, and states in relevant part:

> DISBURSEMENTS. All the necessary disbursements and fees allowed by law; the compensation of referees; a reasonable disbursement for the service of process or other papers in an action when the same are served by a person authorized by law other than an officer, but the item may not exceed the authorized sheriff's fee for the same service; amounts *actually paid out* for certified and other copies of papers and records in any public office; postage, photocopying, telephoning, electronic communications, facsimile transmissions, and express or overnight delivery . . . . (Emphasis added.)

Mercer argues that the photocopy charges submitted by the City's attorney were an internal business expense and therefore do not fit the definition of costs "actually paid out" under WIS. STAT. § 814.04(2). Mercer contends that for a cost to be "paid out," a third party vendor must be involved. We disagree with Mercer's characterization.

First, the statute does not say that photocopy costs must be paid out to a third party before they can be claimed by a defendant. Second, the phrase "actually paid out" modifies the amounts paid "for certified and other copies of papers and records in any public office." The disputed costs here do not involve certified or other papers and records in a public office. Mercer's attempt to apply the phrase "actually paid out" as a limitation on other recoverable costs is not supported by the statute.[2]

¶ 19. We agree with the circuit court that the "literal interpretation" of the statute means that photocopying costs are included, and that no distinction is made between copies produced at a third party print shop or made on an internal office copy machine. Accordingly, the photocopies were properly included in the costs submitted by the City.

## CONCLUSION

¶ 20. We conclude that the undisputed record facts demonstrate that Mercer resigned his position with the City on March 28, 2005. Because his claims against the City rest on his allegation that he was terminated, they fail as a matter of law. Further, we conclude that the photocopy costs submitted by the City are appropriate under WIS. STAT. § 814.04.

*By the Court.*—Judgment and order affirmed.

---

[2] In the circuit court Mercer argued, "There's no provision in the statute for internal costs of operating an office, which is making photocopies . . . . [T]he next step would be to allow legal pads and pens and pencils, and the statute doesn't allow that." Although the statute does expressly allow costs for photocopies, it does not lend itself to the broad and open-ended application that Mercer forecasts.